# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 2, 2005

## STATE OF TENNESSEE v. DENNIS HODGES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-09114     Chris Craft, Judge**

---

**No. W2004-02716-CCA-R3-CD  - Filed September 27, 2005**

---

A Shelby County Criminal Court jury convicted the appellant, Dennis Hodges, of two counts of voluntary manslaughter.  The trial court merged the first count into the second count and sentenced the appellant to fifteen years as a Range III, persistent offender.  In this appeal, the appellant claims (1) that the evidence is insufficient to support the convictions, (2) that the State made improper closing argument, and (3) that his sentence is excessive.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Robert Wilson Jones and Phyllis Aluko (on appeal) and William Robilio and Garland Erguden (at trial), Memphis, Tennessee, for the appellant, Dennis Hodges.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

This case relates to the shooting death of Debra Nguyen.  Ora Murrell testified that in May 2002, she lived at 1213 Springdale, apartment number 5.  Her apartment was adjacent to the victim's apartment, and she and the victim were friends.  She had known the appellant for about five years. On the night of May 21, 2002, Ms. Murrell telephoned the victim and asked if the victim had any Tylenol.  She then walked to the victim's apartment to get the medicine and saw the appellant standing at the victim's back door.  Ms. Murrell walked to the victim's back door and spoke to the appellant, but he did not respond.  Ms. Murrell knocked on the victim's door, and the victim

answered it and gave Ms. Murrell the Tylenol. While the victim still had the door open, the appellant walked up behind Ms. Murrell. The victim asked the appellant, "[H]ow can I help you, baby[?]" Ms. Murrell and the appellant went into the victim's apartment, and the appellant asked the victim for two cigars. Ms. Murrell saw that the appellant had his hands behind his back, and he showed Ms. Murrell a pistol. The appellant then grabbed the victim by the collar, put the gun to the victim's chin, and said, "[G]ive me that money, Bitch[.]" Ms. Murrell heard the victim tell the appellant that she did not have any money, and Ms. Murrell quietly slipped out the door. She started running and screaming, dialed 911 on her cellular telephone, and told the 911 dispatcher that Dennis Hodges was robbing the victim. While she was talking on the telephone, she heard a gunshot. Later that night, she went to the police department and identified the appellant's photograph as the person who robbed the victim.

Corliss Goree testified that at the time of the shooting, she lived in apartment number 2. The victim was known as the "candy lady" because she gave candy to neighborhood children. The victim also sold chips, drinks, and cigarettes to people in the neighborhood. On the night of May 21, Ms. Goree was in the victim's apartment and the two of them were crocheting and watching television in the living room. Ora Murrell knocked on the victim's door, and the victim went into the kitchen to answer it. Ms. Goree heard Ms. Murrell tell the victim that she had come to get some Tylenol. Ms. Goree then heard another knock, and the victim answered the door. Although Ms. Goree could not see into the kitchen, she heard a man say that he wanted a cigar. Ms. Goree heard the man demand money from the victim and heard the victim say, "I don't have any money, Baby." Ms. Goree then heard the man tell the victim, "[G]ive me the money, Debbie. I'm going to shoot your f***ing a**. Ms. Goree said that she was startled, that her chair fell backward, and that the man told her, "[Y]ou better not move in there, Bitch, I'm going to kill you too." The victim asked Ms. Goree to hand the victim's purse to the victim. Ms. Goree gave the victim her purse and saw the victim crawling across the floor. She then saw a hand and a silver gun and heard a gunshot. The man shot the victim three times. Ms. Goree immediately went to the victim and saw that she was not bleeding or breathing. The man ran out the back door, and Ms. Goree ran out the front door to try to see him. The man looked at Ms. Goree, and Ms. Goree saw a muscular man who looked cross-eyed. The man ran behind a dumpster, and Ms. Goree ran upstairs to her apartment to call 911. She said that she had never seen the man before. On cross-examination, Ms. Goree testified that it was dark outside but that porch lights were on. She acknowledged that she did not tell the police the man was cross-eyed.

Officer Tod Ledgerwood of the Memphis Police Department testified that he was dispatched to the victim's apartment about 11:30 p.m. on May 21 and was the first officer on the scene. When he arrived, the victim was lying face-up on the floor and Officer Ledgerwood saw that she had a gunshot wound. He obtained a description of the shooter from witnesses and dispatched the information over his police radio. Officers found and attempted to arrest a person who matched the description, but the man was able to get away from the officers. When the paramedics arrived and moved the victim, they found a loaded revolver underneath her.

Paramedic Matthew Hamm testified that about 11:30 p.m. on May 21, 2002, he was dispatched to 1205 Springdale, apartment number 3. The victim was lying on her back and had been shot once near the heart and twice in the lower abdomen. She had a heart rhythm but no pulse, and she was not breathing. When the paramedics moved the victim onto a spine board, a gun was underneath her.

Doctor O. C. Smith, the Medical Examiner for Shelby County at the time of the victim's death, testified that he performed the victim's autopsy. The victim received two or three gunshot wounds. The first wound entered the victim's upper left chest. The second wound entered the victim's lower left abdomen. The bullet from the second gunshot may have exited the victim's body and re-entered the body though the victim's right thigh. The wound to the victim's right thigh may also have come from a third bullet. The victim had a small laceration to the back of her head, but Dr. Smith stated that she probably received the laceration about an hour before the shooting. He concluded that the cause of death was multiple gunshot wounds and that the manner of death was a homicide. On cross-examination, he testified that no alcohol was found in the victim but that methadone was present.

Steve Barron, the victim's brother, testified that he lived with his sister and that she took methadone for arthritis pain. On the night of the shooting, Mr. Barron was in the back bedroom with his father. He heard a noise and walked out of the bedroom and toward the kitchen. He said that the victim was sitting in the living room and that he saw someone holding a gun. When Mr. Barron saw the gun, he jumped back. He heard gunshots and went into the living room. The victim was slouched over, and Mr. Barron telephoned 911. He stated that he had schizophrenia and acknowledged that he had a difficult time remembering what happened on the night of the shooting. On cross-examination, Mr. Barron testified that when the victim answered her door at night, she usually carried a gun with her.

The appellant testified that on the day of the victim's murder, he was "hanging out" at the victim's apartment complex with Dale Washington and Darsey Murrell. At some point, Murrell began talking about "knocking off the candy lady." The appellant thought Murrell was joking and told Murrell that he would not gain anything by doing that. The appellant stated that he sent Murrell to the victim's apartment to buy a cigar and that he sat on the steps near the victim's back door. While he was waiting on Murrell, he heard someone yell. Ora Murrell came out of the victim's apartment, and she was yelling that someone was robbing the candy lady. The appellant then heard two gunshots and ran. He stated that he had nothing to do with the victim's murder. He related that he does not have crossed eyes but that he does have a droopy eyelid.

On cross examination, the appellant testified that he stayed "on the lam" for about one month. On June 16, 2002, the police found him and he gave a statement. He acknowledged that he had lied in previous testimony, testifying that he had no memory of what happened on the night of the shooting. He said that he was testifying truthfully at trial. On redirect examination, the appellant testified that he had not known the victim and that he had never been to her apartment complex before.

Dale Washington testified that Darsey Murrell is his brother. On the day of the shooting, he and his brother had been to Kamishia Harris' apartment. He related that the appellant was known in the neighborhood as a "crack head."

Thamir Freeman testified that she had known Dale Washington for three to four years and that she had known Darsey Murrell for a short time. On the night of May 21, Ms. Freeman was upstairs in her apartment. About 9:00 p.m., the appellant came to Ms. Freeman's apartment and wanted some cigars. The appellant left and about twenty minutes later, Ms. Freeman learned that the candy lady had been killed.

Kamishia Harris testified on rebuttal for the State. In May 2002, Ms. Harris was living in apartment number 5, above the victim's apartment. The day before the shooting, Ms. Harris saw the appellant with Dale Washington and the appellant "just looked crazy." He also was carrying a gun on his person. On the night of the shooting, the appellant came to Ms. Harris' apartment and asked her if she had any cigars. Ms. Harris told the appellant that he would have to go to the candy lady's apartment to get cigars. After the appellant left, Ms. Harris heard noises that sounded like her neighbor's cabinets closing. She later learned that the victim had been killed. Although the appellant had been charged with first degree premeditated murder and first degree felony murder, the jury found him guilty of two counts of the lesser included offense of voluntary manslaughter.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support his convictions for voluntary manslaughter. Specifically, he contends that the evidence shows that the perpetrator went to the victim's apartment to rob her but does not demonstrate that the perpetrator acted in a state of passion produced by adequate provocation. The State argues that the evidence is sufficient for a jury to conclude that the appellant acted in a state of passion produced by adequate provocation. The State also contends that, in any event, the evidence supports convictions for first degree premeditated murder and first degree murder committed during the perpetration of a robbery and that the jury could elect to find the appellant guilty of the lesser included offense of voluntary manslaughter. We agree that the evidence is sufficient to support the convictions for voluntary manslaughter. Moreover, we agree that because the evidence supports convictions for first degree murder, the appellant cannot complain that the jury chose to convict him of the lesser offense.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value

to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). A determination of whether there existed "adequate provocation" is left to the jury. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). Taken in the light most favorable to the State, we believe the evidence is sufficient to support the convictions for voluntary manslaughter. The evidence shows that the appellant had a gun in his hand and entered the victim's apartment, intending to rob her. The appellant then put the gun to the victim's chin and demanded money. After the victim told the appellant that she did not have any money, the appellant shot her two or three times.

In any event, as the State notes in its brief, our supreme court has held that a "defendant will not be heard to complain of conviction of a lesser included offense when he could have been convicted of a higher degree of homicide." State v. Smith, 695 S.W.2d 527, 529 (Tenn. 1985). Voluntary manslaughter is a lesser-include offense of first degree premeditated murder. State v. Sims, 45 S.W.3d 1, 20-21 (Tenn. 2001). First degree premeditated murder is the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; and (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See id. at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Felony murder is defined as a "killing of another committed in the perpetration of . . . any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." See Tenn. Code Ann. § 39-13-401(a).

As stated above, the evidence shows that the appellant went to the victim's apartment, intending to rob her. When the victim asked how she could help the appellant, he asked for two cigars. He then put a gun to the victim's chin and demanded money. Ms. Goree testified that the

appellant told her that he would kill her too, indicating that the appellant premeditated his killing the victim. In Howard v. State, 506 S.W.2d 951, 954 (Tenn. Crim. App. 1973), this court concluded that where the jury was warranted in convicting the defendant of second degree murder, "the jury also could elect to convict the defendant of the lesser offense of voluntary manslaughter, although the facts [did] not comport with the technical definition of that crime." See also State v. Jeffery Lee Mason, No. M2002-01709-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 447, *11 n.2 (Nashville, May 19, 2004) (stating that "[i]n a case like this, where the defendant stands charged with attempted first degree murder, a much more serious offense, the state should not be expected to prove or even try to prove that the killing was mitigated by passion produced by adequate provocation"), perm. to appeal denied, (Tenn. 2004); State v. Anthony Tony Sandy, No. M2001-023760CCA0R3-CD, 2003 Tenn. Crim. App. LEXIS 78, *14-15 (Nashville, Jan. 30, 2003) (citing Howard and concluding that where the evidence supported a conviction for second degree murder, the defendant was not entitled to relief when the jury convicted him of voluntary manslaughter), perm. to appeal denied, (Tenn. 2003). Because we believe that the evidence is sufficient to support convictions for first degree premeditated and felony murder, the appellant cannot complain that the jury chose to convict him of the lesser offense.

## B. Closing Argument

Next, the appellant contends that the State gave improper rebuttal closing argument, implying that "the appellant invented his defense on the second day of trial and that the defense counsel knew that the state's witnesses were telling the truth." However, as noted in the State's brief, the appellant did not raise this issue in his motion for new trial, precluding consideration of the issue on appeal. Tenn. R. App. P. 3(e). Moreover, we discern no plain error. See Tenn. R. Crim. P. 52(b).

## C. Excessive Sentence

Finally, the appellant claims that his sentence is excessive because the trial court improperly enhanced his sentence in light of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the sentencing hearing, Jonathan Barron, the victim's brother, testified that as a result of the victim's death, he had suffered from depression, had suicidal thoughts, and could not work. He stated that his mother cried all the time and that his brother, Steve Barron, had had a "tremendously rough time." He stated that the victim was sweet and would never hurt anyone. He related that the appellant should never get out of prison. Norma Shoemaker, the victim's mother, also testified that the victim would never hurt anyone and that the victim was "an angel on earth."

According to the appellant's presentence report, the then forty-year-old appellant was divorced and had three children. He reported that he dropped out of high school in the ninth grade and had not been employed for the past five years. In the report, the appellant stated that he was diabetic and had high blood pressure. He reported that he used cocaine and alcohol "a lot" and that he participated in a substance abuse program when he was thirty-five years old but did not complete

the program.  The report shows that the appellant has an extensive criminal history, including one conviction for aggravated assault, one conviction for theft of property valued between five hundred and ten thousand dollars, three convictions for selling illegal drugs, four convictions for misdemeanor assault, and one conviction for misdemeanor theft and receiving stolen property.  The report also shows that the appellant has violated probation.

The trial court applied enhancement factor (2), that the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," and gave the factor great weight.  See Tenn. Code Ann. § 40-35-114(2).  The trial court also applied enhancement factors (9), that the appellant "has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community," and (10), that the appellant "possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense," to the appellant's sentences.  See Tenn. Code Ann. 40-35-114(9), (10). The trial court applied no mitigating factors and ordered the appellant to serve fifteen years in the Department of Correction.

Appellate review of the length, range, or manner of service of a sentence is de novo.  See Tenn. Code Ann. § 40-35-401(d).  In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).  The burden is on the appellant to demonstrate the impropriety of his sentences.  See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness.  Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant was convicted of a Class C felony.  At the time the appellant committed the offenses in question, the trial court was to begin at the presumptive minimum, then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors."  Tenn. Code Ann. § 40-35-210(e). The presumptive sentence for a Class C felony is the minimum sentence within the appropriate range.  See Tenn. Code Ann. § 40-35-210(c).  The appellant was sentenced as a Range III, persistent offender. Accordingly, the presumptive sentence was ten years.  See Tenn. Code Ann. § 40-35-112(c)(3). The trial court applied three enhancement factors to the appellant's sentences and gave one of the factors great weight.  In light of the Blakely decision, the appellant claims the trial court improperly applied enhancement factor (10), that he possessed or employed a firearm during the commission of the offense.

The United States Supreme Court released Blakely before the appellant's sentencing hearing. In Blakely, the Supreme Court held that

the "statutory maximum" for <u>Apprendi</u> [<u>v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, (2000),] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

<u>Blakely</u>, 542 U.S. at \_\_\_, 124 S. Ct. at 2537. <u>Blakely</u> did not dispute the appropriateness of a trial court's application of enhancement factor (2), which is based on the existence of a defendant's prior criminal history, but called into question the constitutionality of the application of the remainder of our statutory enhancement factors without such facts being found by a jury or admitted by an appellant.

However, our supreme court recently held that <u>Blakely</u> does not announce a new rule of law and that the "Tennessee Criminal Sentencing Reform Act does not authorize a sentencing procedure which violates the Sixth Amendment right to jury trial." <u>State v. Gomez</u>, 163 S.W.3d 632, 651 n.16 (Tenn. 2005). Given the dictates of <u>Gomez</u>, the appellant's reliance on <u>Blakely</u> must fail.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____

NORMA McGEE OGLE, JUDGE

-8-